196 F.2d 272
 NATIONAL LABOR RELATIONS BOARD
v.
NABORS.
 No. 13526.
 United States Court of Appeals Fifth Circuit.
 April 29, 1952.
Rehearing Denied June 6, 1952.
 
 Owsley Vose, A. Norman Somers, Asst. Gen. Counsel, and David P. Findling, Assoc. Gen. Counsel, all of Washington, D.C., for petitioner.
 Martin Dies, Sr., Lufkin, Tex., for respondent.
 Before HOLMES, BORAH, and STRUM, Circuit Judges.
 STRUM, Circuit Judge.
 
 
 1
 'This is a petition to enforce, and a cross petition to set aside, an order of the National Labor Relations Board, issued April 19, 1950, pursuant to Sec. 10(c) of the National Labor Relations Act, 29 U.S.C.A. 160(c) as amended.' The order requires respondent to cease and desist from interfering with his employees in the exercise of their right to self-organization; to offer to reinstate, with back pay, certain employees discriminatorily discharged because of their union activities; and to post the usual notices of compliance.
 
 
 2
 The Board's order rests upon findings that the respondent violated Sec. 8(a) (1) and (3) of the Act, 29 U.S.C.A. § 158, by threatening and coercing his employees in an effort to discourage the exercise of their right to self-organization, and by discriminating in the hire and tenure of 19 named employees, all of whom the Board ordered reinstated, except two who did not desire it.
 
 
 3
 Respondent denies the unfair labor practices found by the Board; asserts that there is no substantial evidence to support the Board's findings thereof; denies that he attempted to discourage union membership amongst his employees; and avers that the employees in question were laid off for economic reasons, not because of their union activities.
 
 
 4
 Respondent manufactures trailers and truck bodies in Mansfield, Louisiana. Over the 10 years preceding this dispute, respondent had employed a working force ranging in number from 223 to 498 persons. Having become dissatisfied with their wages, a group of respondent's employees met a representative of a local A.F. of L. Union on March 13, 1948, in Shreveport, attended by 26 of respondent's employees, all of whom discussed plans of organization, filled out union application cards, recorded their names as having attended the meeting, and agreed to attempt to keep their activities as secret as possible.
 
 
 5
 When news of the meeting became known, respondent engaged in certain anti-union activities, such as inquiries amongst the employees as to whether they belonged to the union, statements by supervisory employees that the management did not desire a union, a statement by respondent that he would reduce the number of work hours if the employees joined the union, in order to avoid overtime pay, and might close down the plant entirely, and the like. Nevertheless, the organizational efforts resulted in a total union membership of 106 employees by March 26, 1948. On March 21, 1948, an employee named Norwood was made chairman of the organizing committee in respondent's plant. On March 24, 1948, 3 days later, Norwood was warned by a supervisory employee named Spears about the former's activity in signing up men in the plant for membership in the union. On the following day, Norwood was discharged when he arrived for work.
 
 
 6
 A union representative, named Smith, had an appointment for a conference with the respondent, Nabors, at 4 o'clock on the afternoon of March 26, 1948. At 2:30 p.m. on that day, an hour and a half preceding the conference, Nabors delivered a speech to his employees, in which he outlined their privilege of either joining or not joining the union, their right to vote for or against the union, and advised them of the possibility of their work week being reduced from 45 to 40 hours, because of overtime pay requirements, should respondent's plant be unionized, which would result in a reduction of their 'take home' pay. He also made it clear that he did not wish union matters pursued on company time, and that if the plant were unionized he could shut it down, and thus a lot of employees would lose the homes they were purchasing and would be unable to support their families. Respondent made it abundantly clear that he was opposed to his employees joining a union.
 
 
 7
 In the meeting with Smith, which followed at 4 o'clock, Nabors refused to agree to a consent election amongst his employees. Though it is contradicted by Nabors, Smith's testimony is to the effect that Nabors then expressed great opposition to the unionization of his plant. Several employees testified that during the period of about ten days following Nabors' speech, they were questioned at various time by plant foremen and supervisor concerning the union, and were given to understand, at least by inference, that union participation by them would not be to their advantage.
 
 
 8
 On April 8, 1948, 26 employees were laid off, leaving 219 employees remaining, thus effecting a reduction of some ten to fifteen per cent in employees. Of the 26 laid off, 23 were union adherents, 13 of whom attended the Shreveport meeting on March 21st. Included in these 13 were all those who initiated and encouraged the union organizational drive, also the chairman and all members of the membership committee appointed at the March 21st meeting to carry on the unionization drive in respondent's plant, although about 60 employees with less seniority were retained.
 
 
 9
 The union having filed a petition for certification of a bargaining representative, a hearing was ordered thereon for June 30, 1948. Two days prior to the hearing, certain of respondent's employees circulated an anti-union petition throughout the plant, and were successful in obtaining 158 signatures thereon. Respondent did not oppose the circulation of this petition during business hours, although he knew of it.
 
 
 10
 On August 23, 1948, the Board ordered that an election be held amongst respondent's employees to determine whether or not they desired to be represented by the union. On September 14, 1948, the election was held, resulting in defeat, by a substantial majority, of union representation.
 
 
 11
 On April 14, 1948, the union filed a complaint, and on August 25, 1948, an amended complaint, against respondent, alleging unfair labor practices, charging in effect that respondent had impeded and coerced his employees in the right to self-organization granted by Sec. 7 of the Act, 29 U.S.C.A. § 157, and that he discriminatorily discharged Norwood and 22 other employees, because of their union activities. This complaint culminated in the Board's order here under consideration.
 
 
 12
 Respondent insists here, and has steadfastly maintained the position throughout, that the April 8, 1948, lay-offs were necessitated by economic conditions, and that the employees to be laid off were chosen only after considering the merits of each individual case; that union activities were not a factor, but that each employee to be discharged was selected for a legitimate and sufficient reason, such as unsatisfactory work, misconduct, lack of efficiency, dissatisfaction with his job, the employee's family status and responsibilities, length of service with the company, whether or not the employee was a temporary one, and like reasons.
 
 
 13
 The Board found that a reduction in employees on April 8, 1948, was justified by economic conditions, but also found that 18 of the 26 employees to be discharged were discriminatorily selected by respondent because of their union activities. This the respondent vigorously denies.
 
 
 14
 It is well settled that membership in a union does not immunize an employee against discharge. An employer may discharge an employee, with or without cause, notwithstanding union membership, so long as his action does not tend to impede or coerce the employees in their right of self-organization and collective bargaining created by Sec. 7 of the Act, 29 U.S.C.A. § 157. N.L.R.B. v. Riverside Mfg. Co., 5 Cir., 119 F.2d 302. N.L.R.B. v. Continental Pipe Line Co., 5 Cir., 161 F.2d 302; N.L.R.B. v. Fulton Bag & Cotton Miss, 5 Cir., 175 F.2d 675; N.L.R.B. v. Robbins Tire & Rubber Co., 5 Cir., 161 F.2d 798; N.L.R.B. v. Russell Mfg. Co., 5 Cir., 191 F.2d 358. But employees may not be discharged because of, or to discourage, union membership or activity. N.L.R.B. v. Goodyear Tire & Rubber Co., 5 Cir., 129 F.2d 661.
 
 
 15
 While union membership in itself is no bar to the discharge of an employee, it sometimes discloses the real motive actuating an anti-union employer in discharging such employees, notwithstanding other asserted reasons. North Carolina Finishing Co. v. N.L.R.B., 4 Cir., 133 F.2d 714; Burk Bros. v. N.L.R.B., 3 Cir., 117 F.2d 686.
 
 
 16
 The evidence as to the reasons for discharging these employees is in sharp conflict. This court has held that where there is evidence from which conflicting inferences may be drawn, the court will recognize the function of the Board as the trier of the facts, and will not disturb the Board's findings where, as here, they are supported by substantial evidence upon a fair appraisal of the whole record. N.L.R.B. v. Russell Mfg. Co., 5 Cir., 191 F.2d 358; N.L.R.B. v. Robbins Tire Co., 5 Cir., 161 F.2d 798, 801. In cases arising under the National Labor Relations Act, the courts are not permitted to weigh the evidence, resolve its conflicting inferences, nor draw their own inference therefrom. So long as the Board's findings are supported by substantial evidence on the record appraised as a whole, they will not be disturbed. When supported by credible evidence, the Board's choice between two conflicting views may not be displaced, 'even though the court would justifiably have made a different choice had the matter been before it de novo.' Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 494, 71 S.Ct. 456, 465, 95 L.Ed. 456, 467, 470; N.L.R.B. v. United Distillers, 4 Cir., 188 F.2d 353; N.L.R.B. v. Wiltse, 6 Cir., 188 F.2d 917; N.L.R.B. v. Tri-State Casulaty Co., 10 Cir., 188 F.2d 50, 53.
 
 
 17
 The Board admits that economic conditions in April, 1948, justified a reduction in respondent's working force, but other circumstances surrounding the discharges strongly support the Board's findings that they were discriminatory in nature, and that 18 out of the 26 discharged were selected because of their union activities. Although the evidence is in some respects circumstantial and contradictory, considered in the light of all the circumstances the proof makes a strong case against respondent. Even though the economic conditions did necessitate a reduction in respondent's employees, the Board's conclusion that those to be discharged were discriminatorily selected is reasonable, if not inescapable, when it is considered that 23 of the 26 discharged employees were union men; that 13 of these 23 had attended the union organization meeting in Shreveport; that these 13 included those who initiated and encouraged the unionization efforts, and all the committee members selected at the March 21st meeting to represent respondent's employees in their organizational activities; and that sixty or more employees were retained who had less seniority than those discharged. When the working force was again increased in October, 1948, none of the 18 employees whom the Board found were discriminatorily discharged, were re-employed though they were experienced workers. Several of them had worked for respondent more than five years.
 
 
 18
 The fact that respondent retained some union employees does not exculpate him from the charge of discrimination as to those discharged. N.L.R.B. v. Link- Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368, 380; N.L.R.B. v. National Garment Co., 8 Cir., 166 F.2d 233 238; F. W. Woolworth Co. v. N.L.R.B., 2 Cir., 121 F.2d 658, 661; N.L.R.B. v. Sandy Hill Iron Works, 2 Cir., 165 F.2d 660, 662.
 
 
 19
 As to the statements made by respondent himself to the employees in his speech of March 26, 1948, and on other occasions, as to the consequences which might follow adherence to a union: When statements such as these are made by one who is a part of the company management, and who has the power to change prophecies into realities, such statements, whether couched in language of probability or certainty, tend to impede and coerce employees in their right of self-organization, and therefore constitute unfair labor practices. Collins Baking Co. v. N.L.R.B., 5 Cir., 193 F.2d 483, 486; D. H. Holmes Co. v. N.L.R.B., 5 Cir., 179 F.2d 876, 878, 879; N.L.R.B. v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288 293; N.L.R.B. v. American Furnace Co., 7 Cir., 158 F.2d 376, 379.
 
 
 20
 On the record as a whole, the Board's findings are supported by credible evidence. Respondent's reasons for discharging these employees are contradicted by tangible and substantial evidence to the contrary, upon which the Board acted. The contradictory testimony here does not rest upon mere hearsay, hostile inferences and suspicion, as was the case as to that portion of the Board's order which this court refused to enforce in N.L.R.B. v. Russell Mfg. Co., 5 Cir., 191 F.2d 358, headnote 4.
 
 
 21
 The Board's order here under consideration will be
 
 
 22
 Enforced.